TRINA A. HIGGINS, United States Attorney (7349)
TRAVIS K. ELDER, Assistant United States Attorney (11987)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
(801) 524-5682
travis.elder@usdoj.gov

---

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> REAL PROPERTY LOCATED AT 200 MEADOWOOD TRAIL, MARTINSVILLE, VIRGINIA, and <br><br> REAL PROPERTY LOCATED AT 2947 EAST 1300 SOUTH, SPANISH FORK, UTAH, <br><br> Defendants in Rem. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** <br><br> Case No.  2:24-cv-00369-DAK <br><br> Judge  Dale A. Kimball |

Pursuant to Supplemental Rule G(2) of the Federal Rules of Civil Procedure, the United States of America alleges this *in rem* complaint for forfeiture against Real Property Located at 200 Meadowood Trail, Martinsville, Virginia, and Real Property Located at 2947 East 1300 South, Spanish Fork, Utah (Defendant Property):

### NATURE OF THE ACTION

1.      This civil forfeiture action arises from a fraud scheme perpetrated by Kenny Van Der Spek to fraudulently obtain investments from individuals across the United States. Van Der Spek fraudulently obtained investments by misrepresenting to investors and potential investors that he was matching their investments. Van Der Spek was not licensed to invest with the

Securities and Exchange Commission. A large proportion of the investments were sent by interstate wire to accounts controlled by Van Der Spek. Van Der Spek misused investor funds by purchasing the Defendant Property and in purchasing the Defendant Property engaged in monetary transactions that involved more than $10,000 in fraudulently obtained investor funds.

2.      The forfeiture of the Defendant Property is authorized by:

a.      18 U.S.C. § 981(a)(l)(C) because it is property, real or personal, that constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1343, or a conspiracy to commit the same in violation of 18 U.S.C. § 1349; and

b.      18 U.S.C. § 981(a)(1)(A) because it is property, real or personal, involved in transactions or attempted transactions in violation of 18 U.S.C. § 1957, or property traceable to such property.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1345 and 1355(a), and in rem jurisdiction is proper under 28 U.S.C. § 1355(b).

4.      Venue in this Court is proper under 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in the District of Utah; and under 28 U.S.C. § 1395(b) because one of the real properties is in the District of Utah.

## PARTIES

5.      The plaintiff is the United States of America.

6.      The Defendant Property is Real Property Located at 200 Meadowood Trail, Martinsville, Virginia (the Virginia Property), and Real Property Located at 2947 East 1300 South, Spanish Fork, Utah (the Spanish Fork Property).

7.      The Defendant Property has not been seized. The United States does not presently request authority from the Court to seize the Defendant Property. The United States will, as provided by 18 U.S.C. §§ 985(b)(1) and (c)(1):

a.      Post notice of the action and a copy of the Complaint on the Defendant Property;

b.      Serve notice of this action on the titled owner of the Defendant Property, Kenny Van Der Spek or Kira Van Der Spek, along with a copy of the Complaint; and

c.      File a lis pendens in the real property records of Utah County, Utah and Henry County, Virginia that gives notice of the Defendant Property's status as a defendant in this matter.

8.      Persons or entities who reasonably appear to be a potential claimant to the Defendant Property on the facts known to the government include:

a.   Kenny Van Der Spek (born in 1989);

b.   Kira Van Der Spek (born in 1997; née Motock);

c.   A current tenant of the property in Virginia; and

d.   A prospective purchaser of the property Spanish Fork.

## FACTS

**A.      Involved Persons and Entities**

9.      Kenny Van Der Spek (Van Der Spek) is a resident of Utah. Kira Van Der Spek (Kira) is a resident of Utah.

10.      K & K Strategies LLC (K&K) is a limited liability company (entity number 10639971-0160) that was registered in the State of Utah on December 20, 2017, with an address

in Magna, Utah. Kenny was a member and the registered agent of K&K, also with an address in

Magna, Utah.

 **B.** **Van Der Spek's Fraud Scheme**

11. Investigators have identified approximately 54 individuals who have made

payments to or invested with K&K. Most of these investors reside in Illinois and Utah.

12. K&K had a website that provided corporate information, access to an online

platform for investors to login and review their individual accounts and watch live broadcasts of

Van Der Spek day trading. The website characterized the investment platform as a "hedge fund"

with the following description of its platform, offerings, investment qualifications, and fees:



13. The uniform contracts investors signed with K&K characterized the investment as

a hedge fund requiring a minimum investment of $500. The contract also outlined the investment

cycle, fees of 2 percent of the total profit of the month and a 20 percent "fee of the total profit amount year to date on December 31st of each year or when cashing out of the hedge fund."

14.     Van Der Spek also represented to potential investors that he would match their investment, typically by 50 percent, during certain investment windows. Online statements for investors at K&K's website reflected the matches. However, when investigators analyzed bank records for accounts receiving investors funds, investigators observed no matching funds.

15.     Investors were directed to the K&K website to see the alleged balance of their investment.  The investors had a username and password to log into the K&K website to be able see their balance.

16.     Many investors in Illinois learned about K&K through an Illinois-based physician, Investor 1. According to investors, Investor 1 did not actively solicit investors, but he did speak freely of his investment success with K&K. Investor 1 also provided potential investors with contact information for Van Der Spek.

17.     On December 4, 2023, Investor 2, a resident of Decatur, Illinois, filed a complaint with the FBI's Internet Crime Compliance Center (IC3). Investor 2 stated that Investor 2 had invested with K&K owned by Van Der Spek who Investor 2 identified as a resident of South Jordan, Utah. Investor 2 made an initial investment of $40,000 with K&K on May 10, 2023, and a second investment of $40,000 on September 1, 2023. For both investments, Investor 2 obtained cashier's checks from a branch of Central Equity Federal Credit Union in Illinois.

18.     A November 23, 2023 statement from K&K reported Investor 2's balance as $136,319.05.

19.   In late November 2023, Investor 1 contacted several investors and told them that Van Der Spek told Investor 1 that he had lost all of the investor money in a "bad trade." Several investors reported that they attempted to contact Van Der Spek without success.

20.   On or about December 1, 2023, the following message appeared on K&K's website, indicating that "Kenny has gone on the run" and directing investors to a Facebook page titled, K&K Strategies Support Group, where they could share and receive information regarding Van Der Spek's whereabouts and law enforcement reporting.



21.   On or about December 2, 2023, Investor 2 learned from a Facebook Group composed of persons who had invested with K&K that Van Der Spek was "missing" and unreachable and that the investors' money was gone.

22.   On February 28, 2024, Keefin Bickmore (Bickmore), a partner and partial owner of K&K, told investigators that he assisted in managing the K&K website. Bickmore also said that Van Der Spek provided him with spreadsheets representing alleged investor earnings. Bickmore posted these to the website for investor review. When it became evident to Bickmore that Van Der Spek was not responding to Bickmore or clients' efforts to contact him, Bickmore posted a message to the K&K website advising of the termination of the company.

23.     According to the Utah Division of Securities, , as of April 30 2023, Van Der Spek "has never been licensed as a broker-dealer, agent, investment adviser or investment adviser representative in Utah."

**C.     Other K&K Investors**

      *i.     Investor 3*

24.     On December 12, 2023, Investor 3, a resident of Decatur, Illinois, filed a complaint with IC3, alleging a loss of $150,000. Investor 3 reported making an initial investment of $100,000 with K&K on January 27, 2022. This investment was made by wire. Van Der Spek had offered a match of 50 percent for Investor 3's investment. In Investor 3's IC3 complaint, Investor 3 stated that Van Der Spek traded regularly and updated his balance on nearly a daily basis. Investor 3 made another investment of $50,000 with K&K on August 30, 2023, based on representations that Van Der Spek was offering a 50 percent match. Investor 3's online account balance indicated a balance of $278,991.12.

25.     On December 3, 2024, Investor 3 was notified by another investor that Van Der Spek lost all the business funds overnight. Investor 3 also reported Van Der Spek to the State of Utah Attorney General's Office on December 11, 2023.

26.     On January 5, 2024, a Special Agent from the Springfield FBI interviewed Investor 3. Investor 3 confirmed the details in Investor 3's IC3 report.  Additionally, Investor 3 stated that Investor 3 worked for Investor 1 and learned of Van Der Spek through Investor 1. Investor 3 provided the FBI with Investor 3's wire statements, 2022 tax form for her alleged investment earnings, her initial investment contract and email correspondence. The wire

statements showed that Investor 3 wired funds from, Bank of America, Investor 3's bank in Illinois to K&K.

    *ii. Investor 4*

  27. On December 16, 2023, Investor 4, a resident of Mattoon, Illinois, filed an IC3 complaint, alleging a loss of $75,000. Investor 4 reported that on May 11, 2022, Investor 4 made an initial investment of $50,000 with K&K based on representations that Van Der Spek was offering a 50 percent match.  Investor 4 wired the investment from Washington Savings Bank, a bank located in Illinois. Investor 4 was subsequently advised by Investor 1, who had initially introduced her to Van Der Spek, that Van Der Spek had "lost all of the money."  Investor 4 reported that Investor 4 tried to contact Van Der Spek without success.

  28. On January 8, 2024, a Special Agent from the Springfield FBI interviewed Investor 4. Investor 4 confirmed the details of the IC3 report. Additionally, Investor 4 said that on December 3, 2023, she heard from Investor 1 that Van Der Spek had lost the investors' money and that no one had heard from him. Investor 4 said that investors created a WhatsApp group that had approximately 28 members.

    *iii. Investor 5*

  29. On December 16, 2023, Investor 5, a resident of Decatur, Illinois, filed an IC3 complaint alleging a loss of $100,000. Investor 5 reported making an initial investment of $50,000 with K&K on December 27, 2021, and a subsequent investment of $50,000 with K&K on March 14, 2023.

  30. Prior to investing, Van Der Spek explained to Investor 5 his "disciplined day trading strategy" including the use of low-risk strategy. Van Der Spek also said that he offered

50 percent matches of his own funds for 2022 investments and that these matches would belong to Investor 5 after one year.

31.      In his complaint, Investor 5 also reported that he could follow his personal results daily. Investor 5 learned about K&K from Investor 1, a friend who indicated he had been shown the results of the E*TRADE accounts used to invest and all seemed proper.

32.      K&K provided Investor 5 with a 1099 for 2022, indicating short term gains of $43,389. Investor 5 paid taxes on those gains.

33.      Investor 5 noticed that K&K had only traded on 6 days in November 2023, which seemed strange to him. Investor 5 then learned from Investor 1 that Van Der Spek had said that he had lost everything. Investor 1 told Investor 5 that Van Der Spek had lost approximately $10 million in K&K and all his personal funds. Investor 5 believed that this would not have happened had Van Der Spek really followed the format and strategy that Van Der Spek had represented to Investor 5. Investor 5's last reported account balance equaled $205,789.20.

34.      On January 5, 2024, a Special Agent of the Springfield FBI office interviewed Investor 5. Investor 5 confirmed the information in Investor 5's IC3 complaint and also indicated that Investor 5's daughter and son-in-law invested $20,000 with K&K in the summer of 2023 and were promised a ten percent match.

      *iv.   Investor 6*

35.      On December 2, 2023, Investor 6, a resident of Provo, Utah, filed an IC3 complaint alleging a loss of $47,000. In the complaint, Investor 6 reported investing $60,000 with K&K. Investor 6 wired $40,000 on February 2, 2022, and an additional $20,000 on August

25, 2023. Investor 6 wired the investment from his account at Utah County Credit Union to AFCU 9486, an account under Van Der Spek's control.

36.     Investor 6 was only able to make one successful withdrawal from Investor 6's K&K account on October 4, 2023, for $13,000.

37.     On Monday, November 27, 2023, Investor 6 tried contacting Van Der Spek to withdraw $80,000. Investor 6 reported that since that time, no one, including Van Der Spek's family members and business partner have been able to contact him. Investor 6 stated that he emailed, texted, and called Van Der Spek multiple times the week prior to filing the IC3 complaint with no response. Investor 6 reported that Van Der Spek's business partner, Bickmore, went to Van Der Spek's house in South Jordan, Utah, but was unable to contact him.

38.     On December 8, 2023, Investor 6 confirmed to investigators the information in Investor 6's IC3 complaint.

39.     Van Der Spek told Investor 6 he was a "mom and pop hedge fund" and day trader who was trading in a smarter and safer way so as not to incur as many losses.

40.     Van Der Spek offered a 50 percent match to Investor 6's investment.

41.     In November 2023, Investor 6 attempted unsuccessfully to withdraw funds from his K&K account.

42.     Van Der Spek stopped responding to Investor 6's withdrawal requests in November 2023.

    *v.  Investor 7*

43.     On December 12, 2023, Investor 7, a resident of Summerville, South Carolina, filed an IC3 complaint alleging a loss of $38,000. In Investor 7's complaint, Investor 7 noted an

initial investment with K&K on October 31, 2021, of $10,000. Investor 7 made subsequent

investments of $15,000 on December 21, 2021, and $13,000 on November 23, 2022. Investor 7

made these investments by wiring funds from Investor 7's Wells Fargo account to Van Der

Spek's E*TRADE account. Investor 7 said that Investor 7 and other investors were provided

with a website ledger that showed personal account balances and how investments were growing.

The ledger stopped being updated on November 27, 2023. As of November 28, 2023, no one has

been able to contact Van Der Spek aside from his brothers and two or three other investors.

44.     On February 6, 2024, Investor 7 confirmed with investigators in an interview the

information in Investor 7's IC3 complaint. Additionally, Investor 7 said he learned of Van Der

Spek through his best friend.  The spouse of Investor 7's best friend had served a church mission

with Van Der Spek. He interacted with Van Der Spek by telephone, text, and email. Investor 7

also met Van Der Spek in person on two occasions.  Investor 7 oversees a Facebook group that

informs victims of what is going on with respect to Van Der Spek. Investor 7 also directs victim

investors to IC3 as well as to the Utah Department of Securities and the Federal Trade

Commission. Investor 7 has directed some of the victims to the Securities and Exchange

Commission.

      **D.     Receipt of Investor Funds by Van Der Spek**

45.     Investigators determined that investors sent their funds to K&K through a variety

of methods, including Venmo, check and wire transfer.  Funds were directed either to an account

in Van Der Spek's name at American First Credit Union (AFCU) ending in 4135 (AFCU 4135)

or to E*TRADE from Morgan Stanley account ending in 7935 (E*TRADE 7935).

46.     Van Der Spek signed an agreement opening E*TRADE 7935 on October 25, 2016.  The name on the E*TRADE 7935 account was Kenny D. Van Der Spek and the account type was individual.

47.     AFCU is a Utah-based credit union with branches located north of Salt Lake City.

48.     E*TRADE from Morgan Stanley is an electronic trading platform for trading financial assets with headquarters in Arlington, Virginia.

     i.     *Analysis of E*TRADE 7935 & AFCU 4135*

49.     Between January 1, 2019, and March 20, 2023, prior to the Van Der Spek's purchases of the Defendant Property, E*TRADE 7935 received deposits from 26 investors totaling $2,581.224.50. Contrary to Van Der Spek's representations to investors, E*TRADE 7935 records show that none of these investments were matched. Account activity during this time also included deposits of suspected investor funds and deposits from AFCU 4135:

| Source of Funds in E*TRADE 7935 | Amount | % of Deposits |
|---|---|---|
| Investor Deposits | $2,581,224.50 | 65.91% |
| Suspected Investor Deposits | $732,060.33 | 18.46% |
| AFCU 4135 | $613,500.00 | 15.62% |
| **Total** | **$3,926,784.83** | **100%** |

50.     The deposits into E*TRADE 7935 from AFCU 4135 are primarily traceable to investor funds. Between January 1, 2020, and March 20, 2023, at least 72.9 percent of funds deposited into AFCU 4135 trace to funds of confirmed or suspected investors. Additionally, during this period, more funds were sent to AFCU 4135 from E*TRADE 7395 than were deposited from it:

| Flow of Funds from E*TRADE 7395 to AFCU 4135 |
|---|

| Money Into E*TRADE | Money Out of E*TRADE | Net Sent to AFCU from E*TRADE |
|---|---|---|
| $613,500 | $1,057,985 | $444,485 |

51.     During the same time frame, Van Der Spek also sent $26,000 to an account in the name of Kira Motock at Morgan Stanley.  Additionally, Van Der Spek withdrew another $1,045,558.74 from E*TRADE that he used to pay some of the investors and for purposes unknown at this time.

**E.     Van Der Spek's Purchase of 2947 East 1300 South, Spanish Fork, Utah with Criminal Proceeds**

52.     Van Der Spek purchased the Spanish Fork Property in March of 2022 using funds traceable to K&K investments. According to a March 31, 2022 settlement statement, Van Der Spek purchased the property for $535,000. After title charges, settlement charges, commissions, and other charges related to the purchase, Van Der Spek owed $530,555.42. An Acknowledgement of the ALTA Settlement Statement and Seller's and/or Purchaser's/Borrower's Statement is DocuSigned by "Kenny Vanderspek."

53.     An Incoming Wire Details report dated March 30, 2022, and E*TRADE 7395 account records confirm that Van Der Spek wired $530,555.42 to First American Title Insurance Company for the purchase.

54.     At the time of the $530,555.42 wire on for the Spanish Fork Property's purchase, E*TRADE 7395 had received $1,478,684.50, or 67.7 percent of its total deposits, from 22 investors. At that time, E*TRADE 7395 had also received a $168,515 net inflow from AFCU 4135, and $125,441.45 in net inflows from suspected investors. Even if the funds from AFCU 4135 and from suspected investors were non-investor funds, the non-investor funds would have

covered only 55.4 percent of the $530,555.42 wire. As such, the purchase of the property would not have been possible without investor funds.

55.     The purchase of the Spanish Fork Property cannot be accounted for by gains from trading. In March 2022, when the Spanish Fork property was purchased, the net account value for E*TRADE 7395 at the start of the month was only $745,440.03.

56.     A notarized Warranty Deed shows that Van Der Spek is the titled owner of the property.

57.     Currently, the property is on the market with a pending sale.

**F.     Kira's Purchase of 200 Meadowood Trail, Martinsville, Virginia with Criminal Proceeds**

58.     Kira purchased the Virginia Property in March of 2023 using funds traceable to K&K investments. According to a March 20, 2023 settlement statement, Kira purchased the property for $575,000. At the time of the settlement, Kira was Van Der Spek's spouse. The settlement statement also identifies an earnest money deposit of $5,750 and an additional $100,000 deposit per the purchase contract. After taxes, fees and commissions, Kira owed $473,677.34.  The Settlement statement is Docusigned, "Kira Motock" on the signature line for Kira Van Der Spek.

59.     A Single Ledger Balance (w/Disbursement Approval) for Settlement Date, March 20, 2023, shows three wires from Van Der Spek or Kira to Virginia Title for the payment of the property including:

- February 14, 2023:        $5,750

- February 27, 2023:        $100,000

- March 20, 2023:           $473,677.34

60.     Records for E*TRADE 7395 show corresponding wire withdrawals to Virginia Title Center for $100,000.00 on February 27, 2023, and $473,677.34 on March 20, 2023.

61.     At the time of the $473,677.34 wire, E*TRADE 7395 had received $2,581,224.50 (65.9% of its total deposits) from 26 investors. At that time, E*TRADE 7395 had sent a net amount of $444,485.00 to AFCU 4135 and had received a net $562,787.33 from suspected investors. Even if all the funds from suspected investors were non-investor funds, those deposits would not have covered the total $573,677.34 paid from E*TRADE for the purchase of the property. As such, the purchase of the property would not have been possible without investor funds.

62.     The purchase of the Virginia Property cannot be accounted for by gains from trading. In March 2023, when the property was purchased, the net account value of E*TRADE 7395 at the start of the month was in the negative (-$396,553.70) based on beginning securities value and beginning margin balances.

63.     Van Der Spek is also attempting to sell this property.  On February 6, 2024, investigators interviewed a tenant who has been living on the property with the tenant's family. The tenant had entered a contract to purchase the property from Van Der Spek and had been making payments on that contract. On January 31, 2024, the tenant was served with an eviction notice by Van Der Spek even though the tenant was current on payments. Van Der Spek told the tenant that the house was going to be seized very soon and he was making a deal with the SEC to sell the home and get them the proceeds. On February 6, 2024, the tenant recorded a conversation with Van Der Spek in which he told the tenant that there would be a grand jury the

following day. Investigators contacted the SEC and determined that no such grand jury had been

convened.

### FIRST CAUSE OF ACTION
18 U.S.C. § 981(a)(1)(C)
(Wire Fraud Forfeiture)

64.     The United States incorporates by reference herein all allegations previously

made.

65.     Under 18 U.S.C. § 981(a)(l)(C), any property, real or personal, which constitutes

or is derived from proceeds traceable to an offense constituting a "specified unlawful activity,"

or a conspiracy to commit such offense, is subject to forfeiture to the United States.

66.     Under 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1), wire fraud in violation of 18

U.S.C. § 1343 is a specified unlawful activity.

67.     Title 18, United States Code, Section 1343, provides that:

> Whoever, having devised or intending to devise any scheme or
> artifice to defraud, or for obtaining money or property by means of
> false or fraudulent pretenses, representations, or promises, transmits
> or causes to be transmitted by means of wire . . . in interstate or
> foreign commerce, any writings, signs, signals, pictures, or sounds
> for the purpose of executing such scheme or artifice shall be guilty
> of a crime.

68.     As described above, the Defendant Property was involved in one or more

violations of 18 U.S.C. § 1343, or a conspiracy to do so.

69.     Therefore, the Defendant Property is subject to forfeiture under 18 U.S.C. §

981(a)(1)(C).

**SECOND CAUSE OF ACTION**
18 U.S.C. § 981(a)(1)(A)
(Expenditure Money Laundering Forfeiture)

70.     The United States reasserts all allegations previously made.

71.     Under 18 U.S.C. § 981(a)(1)(A) all property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or any property traceable to such property is subject to forfeiture.

72.     Title 18, United States Code, Section 1957(a) prohibits knowingly engaging or attempting to engage in a monetary transaction in criminally derived property that has a value greater than $10,000 and is derived from specified unlawful activity.

73.     Wire Fraud in violation of 18 U.S.C. § 1343 is a specified unlawful activity under 18 USC §§ 1956(c)(7)(A) and 1961(1)(B).

74.     As set forth above, the Defendant Property was involved in one or more monetary transactions that violated 18 U.S.C. § 1957 or is traceable to such property.

75.     Therefore, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

**REQUEST FOR RELIEF**

WHEREFORE, the United States respectfully asserts that the Defendant Property is forfeitable to the United States under 18 U.S.C. §§ 981(a)(l)(A) and (C).

The United States further requests:

A.     That, pursuant to 18 U.S.C. § 985(c)(1)(B), notice of this complaint be posted on the Defendant Property.

B.      That Notice of this action be given to the property owner and all persons known or thought to have an interest in or right against the Defendant Property;

C.      That a Judgment of Forfeiture be decreed against the Defendant Property forfeiting all right, title, and interest in it to the United States;

D.      That upon the issuance of a Judgment of Forfeiture, the United States Marshals Service or its delegate be able to dispose of the Defendant Property according to law; and

E.      That the United States receives its costs of court and all further relief to which it is entitled.

Dated this 23rd day of May, 2024.

TRINA A. HIGGINS
United States Attorney


*/s/ Travis K. Elder*
TRAVIS K. ELDER
Assistant United States Attorney

## VERIFICATION

I, Special Agent Paul Drew Scown II, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint *In Rem* and verify under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements contained therein are true and correct to the best of my knowledge and belief.

Executed on this 22nd day of May, 2024.

Paul Drew Scown II, Special Agent
Federal Bureau of Investigation